IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Curtis L. Harkness, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 8:05-1019-HMH |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| City of Anderson, S.C., City of | ) | |
| Anderson, S.C. Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the City of Anderson, S.C. ("Anderson") and the City of Anderson, S.C. Police Department's ("Anderson Police Department") (collectively "Defendants") motion for summary judgment. Curtis L. Harkness ("Harkness") filed a complaint pursuant to 42 U.S.C. § 1983 alleging that the Defendants violated his constitutional rights. Harkness also alleges state law claims for false arrest, outrage, and slander per se. For the reasons set forth below, the court grants the Defendants' motion for summary judgment.

**I. PROCEDURAL AND FACTUAL BACKGROUND**

The matter arises from the arrest of Harkness on March 9, 2002, in connection with two murders in Anderson, South Carolina. On March 8, 2002, at approximately 11:07 p.m., the Anderson County Public Safety Division was notified that multiple shots had been heard near Piedmont Avenue. (Defs.' Mem. Supp. Summ. J. 2 Ex. 1 (Zamberlin Aff. ¶ 4).) At approximately 11:40 p.m., Sergeant John A. Zamberlin ("Zamberlin"), a detective with the

1

Anderson Police Department, arrived on the scene and found Lamar Warnsley ("Warnsley"), who had died of gunshot wounds. (Id. ¶¶ 5-6.) A second gunshot victim, Marcus Hunter ("Hunter"), had been transported to the hospital. (Id. ¶¶ 5,7.) Hunter died later at the hospital. (Id.)

Zamberlin and Lieutenant Layton Creamer ("Creamer") notified the victims' parents of their sons' deaths. (Id. ¶ 8.) Warnsley's mother informed Zamberlin and Creamer that she last saw Warnsley between 4:00 and 4:30 p.m. on March 8, 2002, when he left the house with a man named "Marcus" and a young man named "Dustin." (Defs.' Mem. Supp. Summ. J. Ex. 1 (Zamberlin Aff. ¶ 9).) Lieutenant James Johnson ("Johnson") and Sergeant Ken Ebernickle ("Ebernickle") determined that "Dustin" was possibly a twelve-year-old boy named Russell Calhoun. (Id. ¶ 10.) Subsequently, Warnsley's mother identified Russell Calhoun as the young man that she knew as "Dustin" (hereinafter "Dustin"), who was with Warnsley on the day of the shootings. (Id. ¶ 12.)

On March 9, 2002, detectives located Dustin, and he voluntarily submitted to an interview at the Anderson Police Department. (Id. ¶ 11.) At 9:20 a.m., Dustin provided a written statement regarding the shooting incident in which he related that he met up with Hunter and Warnsley at Warnsley's house around 3:00 p.m. on March 8, 2002. (Defs.' Mem. Supp. Summ. J. Ex. 1-B (Dustin's First Statement).) Dustin declared that Warnsley had a silver and black .380 caliber gun and intended to kill "Kurt." (Id.) Dustin did not know Kurt's last name, but knew the location of his residence. (Id.) The two men and Dustin left Warnsley's house and went to Anderson Mall. (Id.) Around 10:00 p.m., Warnsley, Dustin, and Hunter left the mall and walked to Friendship Court Apartments. (Id.) Warnsley

had placed the gun in his waistband. (Defs.' Mem. Supp. Summ. J. Ex. 1-B (Dustin's First Statement).) According to Dustin, Warnsley again said that he intended to kill "Kurt." (Id.) At this time, Dustin called for a cab and went home. (Id.) When Dustin left, Warnsley and Hunter were walking with a white male named "John." (Id.) Dustin also stated that Warnsley had stolen a moped from "Kurt's" cousin, "Tez," and Kurt had been riding by Warnsley's house. (Id.)

The officers were unable to corroborate Dustin's claim that he had called a cab. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Zamberlin Aff. ¶ 14).) The officers brought Dustin in for additional questioning, and Dustin admitted lying about calling a cab because he was afraid the shooter would come after him. (Id. ¶ 15.)

In a second written statement given at 1:51 a.m. on March 9, 2002, Dustin said that he met Warnsley and Hunter at Warnsley's house around 3:00 p.m. on March 9, 2002. (Defs.' Mem. Supp. Summ. J. Ex. 1-C (Dustin's Second Statement).) Warnsley had a black and silver gun with him and said that he was going to kill "Kurt." (Id.) The group went to the Little General store and were walking back to Warnsley's house when "Kurt" drove by in a blue car. (Id.) Warnsley fired his gun four times, hitting the car. (Id.) "Kurt" stopped the car a little bit up the road, examined the car, and drove off. (Id.) After returning to Warnsley's house, Warnsley, Hunter, and Dustin walked to the mall. (Defs.' Mem. Supp. Summ. J. Ex. 1-C (Dustin's Second Statement).) Around 10:00 p.m., they left the mall and walked to Friendship Court Apartments towards Warnsley's house. (Id.) At that time, "Kurt" drove up beside them in a gray Cadillac with rims on the wheels. (Id.) "Tez" was in the car with "Kurt." (Id.) "Kurt" exited the car and took Warnsley's gun, shooting Warnsley

3

once in the head. (Id.) Then "Kurt" shot Hunter twice and Warnsley four more times. (Defs.' Mem. Supp. Summ. J. Ex. C (Dustin's Second Statement).) Dustin again informed the officers in his statement that he knew where Kurt lived. (Id.) In addition, Dustin said that "Kurt" had bumps on his face. (Id.)

The detectives attempted to verify Dustin's statements. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Zamberlin Aff. ¶ 18).) They determined that "Kurt" was possibly Harkness, a known drug dealer with a gray Cadillac and a bad complexion. (Id. ¶ 18a.) The detectives' conclusion was corroborated by Dustin identifying "Kurt's" house and the gray Cadillac on the property to Zamberlin. (Id. ¶ 18c.) A license plate check revealed that the Cadillac was registered to Harkness. (Id. ¶ 18c).) Dustin showed Zamberlin the route Warnsley, Hunter, and he took from the mall to Friendship Court Apartments. (Id. ¶ 18d.) Ebernickle confirmed that "Tez" was related to Harkness and lived next door. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Zamberlin Aff. ¶ 18e).)

Dustin was shown a photographic line-up at 3:13 p.m. on March 9, 2002. (Id. ¶ 19.) From the photographic line-up, Dustin identified Harkness as the person who shot Warnsley and Hunter. (Id.) Based on Dustin's statements and his identification of Harkness, two arrest warrants for murder were obtained. (Id. ¶ 20).) Harkness was arrested at 9:49 p.m. on March 9, 2002. (Id. ¶ 21.) After arraignment, Harkness was transferred to Anderson County Detention Center on March 11, 2002. (Id. ¶ 24.)

The Anderson Police Department continued investigating the murders and later determined that Dustin murdered Warnsley and Hunter. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Zamberlin Aff. ¶¶ 25, 32).) The charges against Harkness were dropped, and he was released from jail. (Id. ¶ 32.) Harkness filed suit alleging constitutional violations pursuant

to 42 U.S.C. § 1983[1] and state causes of action for false arrest,[2] outrage, and slander per se. The Defendants move for summary judgment on all of Harkness's causes of action on the grounds that (1) they had probable cause to arrest Harkness for murder; (2) they are not proper parties to a § 1983 action; (3) the police officers are entitled to qualified immunity; (4) the Defendants are immune from a suit for outrage; (5) Harkness fails to state a claim upon which relief may be granted for outrage; and (6) Harkness fails to state a claim for slander per se. Harkness failed to respond to the summary judgment motion.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-

---

[1] Harkness alleged essentially the same false arrest claim in both the third and sixth causes of action. As such, the third and sixth causes of action will not be addressed separately.

[2] Harkness alleged essentially identical § 1983 claims as a result of false arrest in the first and fifth causes of action. As such, the first and fifth causes of action will not be addressed separately.

moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

### B. False Arrest

The Defendants allege they are entitled to summary judgment on Harkness's false arrest claim because they had probable cause to arrest Harkness. "The fundamental question in determining whether an arrest is lawful is whether there was probable cause to make the arrest." Wortman v. Spartanburg, 425 S.E.2d 18, 20 (S.C. 1992) (internal quotation marks omitted). "Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests upon such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe likewise." Id. "South Carolina follows the minority rule that the issue of probable cause is a question of fact and ordinarily one for the jury." Jones v. City of Columbia, 389 S.E.2d 662, 663 (S.C. 1990). However, in this case, the evidence only supports one conclusion—the Defendants had probable cause to arrest Harkness.

The Defendants had a good faith belief that Harkness had committed the murders based on the statements given by Dustin. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Zamberlin Aff. ¶ 33).) The officers verified many aspects of Dustin's statements. Further, Dustin identified Harkness from a line-up. (Id.) In addition, Dustin was a twelve-year-old boy with no violent criminal history. (Id.) Harkness has produced no evidence to counter the overwhelming evidence that the Defendants had probable cause to arrest him. As such, there are no genuine issues of material fact concerning Harkness's false arrest claim, and the court grants the Defendants' summary judgment motion on the claim.

### C. Outrage

The Defendants argue they are immune from suit pursuant to the South Carolina Tort Claims Act ("SCTCA"), South Carolina Code of Laws Section 15-78-10 et seq., on the claim of outrage, otherwise known as intentional infliction of emotional distress. Doe v. S.B.M. 488 S.E.2d 878, 879 (S.C. Ct. App. 1997). The court agrees. The SCTCA does not waive sovereign immunity for this claim. Section 15-78-50 of the SCTCA states, "Any person who may suffer a loss proximately caused by a tort of the State, an agency, a political subdivision, or a governmental entity, and its employee acting within the scope of his official duty may file a claim" as provided in this chapter. S.C. Code Ann. § 15-78-50(a) (2005). "Loss," as defined by section 15-78-30, expressly excludes "intentional infliction of emotional harm." S.C. Code Ann. § 15-78-30(f). Furthermore, the SCTCA excludes liability for "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." § 15-78-60(17). As such, an

employee's intentional torts are excluded from suit under the SCTCA. See id.[3] Therefore, the Defendants are entitled to summary judgment.

### D. § 1983 claim

The Defendants allege that they are entitled to summary judgment on the § 1983 action because the Defendants are not entities that can be sued under § 1983. Harkness alleges that the Defendants falsely arrested him in violation of the Fourth and Fourteenth Amendments of the Constitution. (Compl. ¶ 14.) However, Harkness has failed to establish a basis for liability under the Supreme Court's holding in Monell v. Department of Social Services, 436 U.S. 658, 694 (1978). In Monell, the Court held,

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. at 694. Harkness has neither alleged nor provided evidence of an official policy or custom. As such, the Defendants are not proper defendants and are entitled to summary judgment on the § 1983 claims.[4]

---

[3] The court declines to address the Defendants' other arguments for dismissal of Harkness's outrage claim.

[4] Even if Harkness had sued the officers individually, his § 1983 action would fail because there was probable cause to arrest Harkness. As such, there has been no violation of Harkness's federal rights. "Probable cause will be found to exist when the facts and circumstances within an officer's knowledge–or of which he possesses reasonably trustworthy information–are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002) (internal quotation marks omitted). Dustin's statements and his identification of Harkness provided the officers with probable cause to arrest Harkness.

**E. Slander per se**

Additionally, the Defendants move for summary judgment on Harkness's slander per se claim. Harkness alleges that the Defendants wrongfully accused him of committing the murders. (Compl. ¶ 17.) Although accusations of a crime are slanderous per se, these defamatory statements may be protected by a qualified privilege. See Holtzscheiter v. Thomson Newspapers Inc., 506 S.E.2d 497, 502 (S.C. 1998). "The protection of [qualified] privilege extends generally to remarks made in the prosecution of an inquiry regarding a crime which has been committed; and for the purpose of detecting and bringing the criminal to punishment." Bell v. Bank of Abbeville, 38 S.E.2d 641, 643 (S.C. 1946), distinguished by, Pelot v. Davison-Paxon Co., 62 S.E.2d 95 (S.C. 1950).

However, the speaker can lose this qualified privilege by speaking with actual malice. See Constant v. Spartanburg Steel Prods., Inc., 447 S.E.2d 194, 196 (S.C. 1994). "Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights." Id. "[T]he burden will be upon the plaintiff to show . . . actual malice." Bell, 38 S.E.2d at 643. There is no evidence that the Defendants acted with actual malice in investigating the murders and arresting Harkness. Therefore, the Defendants are entitled to summary judgment on this claim because there is no genuine issue of material fact.

9

It is therefore

**ORDERED** that the Defendants' motion for summary judgment, Document number 13, is granted.

**IT IS SO ORDERED**.

s/ Henry M. Herlong, Jr.<br>
United States District Judge

Greenville, South Carolina
October 25, 2005